TRACY L. WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
ANDREW BROWN (Cal. Bar No. 172009)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-0102
    Facsimile:  (213) 894-6269
    E-mail:     andrew.brown@usdoj.gov
Attorneys for Defendant
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOES 1-6,<br><br>       Plaintiffs,<br><br>       v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>       Defendants. | No.  2:21-cv-03254-MCS-SK<br><br>DEFENDANTS' OPPOSITION TO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER; DECLARATIONS OF AUSA BROWN AND SA PALMERTON; EXHIBIT |

    The government hereby opposes the ex parte application of Does 1-6 for a temporary restraining order.

Dated: April 16, 2021      Respectfully submitted,

                       TRACY L. WILKISON
                       Acting United States Attorney

                       BRANDON D. FOX
                       Assistant United States Attorney
                       Chief, Criminal Division

                       /s/ *Andrew Brown*
                       _____
                       ANDREW BROWN
                       Assistant United States Attorney

                       Attorneys for Plaintiff
                       UNITED STATES OF AMERICA

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES...............................................ii

MEMORANDUM OF POINTS AND AUTHORITIES...............................1

A.   BACKGROUND REGARDING USPV.....................................1

B.   FACTS.........................................................2

C.   PLAINTIFFS HAVE NOT ESTABLISHED A BASIS FOR INTERFERING WITH A
     CRIMINAL INVESTIGATION OR ANY IRREPARABLE INJURY..............4

D.   PLAINTIFFS ARE NOT ENTITLED TO SERVICE OF THE WARRANTS AGAINST
     USPV, OR AN INVENTORY OF THE ITEMS SEIZED, WHICH WOULD
     UNDERMINE THE VERIFICATION PROCESS IN ANY EVENT...............6

E.   PLAINTIFFS HAVE FAILED TO SHOW A RISK OF SPOILATION...........7

F.   PLAINTIFFS HAVE NOT DEMONSTRATED LIKELIHOOD OF SUCCESS ON THE
     MERITS........................................................7

G.   PLAINTIFFS MISUNDERSTAND THE FBI'S CLAIMS PROCEDURE..........10

H.   NO SPECIAL MASTER IS WARRANTED...............................13

I.   PLAINTIFFS SHOULD NOT BE PERMITTED TO PROCEED ANONYMOUSLY....13

J.   CONCLUSION...................................................17

DECLARATION OF ANDREW BROWN

DECLARATION OF SA JUSTIN PALMERTON

EXHIBIT

i

**TABLE OF AUTHORITIES**

**SUPREME COURT OPINIONS:**                                              **PAGE(S)**

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997)  ........................................  4

*Nixon v. Warner Commc'ns, Inc.,*
  435 U.S. 589–99 (1978)  ....................................  13

*United States v. Nixon,*
  418 U.S. 683 (1974)  .......................................  4

*Winter v. Natural Res. Def. Council, Inc.*
  555 U.S. 7 (2008)..........................................  4, 6

**FEDERAL COURT OPINIONS:**

*Blinder, Robinson & Co., Inc. v. United States,*
  897 F.2d 1549 (10th Cir. 1990)  ...........................  8

*Burlington N. R. Co. v. Wash. Dep't of Revenue,*
  934 F.2d 1064 (9th Cir 1991)  .............................  13

*Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate,*
  596 F.3d 1036 (9th Cir. 2010)  ............................  13

*Does I thru XXIII v. Advanced Textile Corp.,*
  214 F.3d 1058 (9th Cir. 2000)  ....................  13, 14, 15

*EEOC v. Erection Co.*
  900 F.2d 168 (9th Cir. 1990)  .............................  13

*Jane Roes 1-2 v. SFBSC Mgmt., LLC,*
  77 F. Supp. 3d 990 (N.D. Cal. 2015)  ......................  14

*Kiesel Company, Inc. v. Householder,*
  879 F.2d 385 (8th Cir. 1989)  ...........................  8, 9

*Kitty's East v. United States,*
  905 F.2d 1367 (10th Cir. 1990)  .........................  8, 9

*LaRouche v. Webster,*
  566 F. Supp. 415 (S.D.N.Y. 1983)  .......................  4, 5

*Meier v. Keller,*
  521 F.2d 548 (9th Cir. 1975)  .............................  8

*Melendres v. Arpaio,*
  695 F.3d 990 (9th Cir. 2012)  .............................  6

*Olagues v. Russoniello,*
  770 F.2d 791 (9th Cir. 1985)  ...........................  4, 5

*Ramsden v. United States,*
  2 F.3d 322 (9th Cir. 1993)  ...........................  passim

ii

**TABLE OF AUTHORITIES (CONTINUED)**

**FEDERAL COURT OPINIONS:**                                               **PAGE(S)**

*Richey v. Smith*,
    515 F.2d 1239 (5th Cir. 1975) .................................  9

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th 2001) ........................................  4

*Sociedad Anonima Vina Santa Rita v. U.S. Dep't of the Treasury*,
    193 F. Supp. 2d 6 (D.D.C. 2001) ................................ 4

*United States v. Burzynski Cancer Rsch. Inst.*,
    819 F.2d 1301 (5th Cir. 1987) .................................  5

*United States v. Derrick*,
    163 F.3d 799 (4th Cir. 1998) ............................... 4-5

*United States v. Doe*,
    655 F.2d 920 (9th Cir. 1981) ................................. 14

*United States v. Olson*,
    504 F.2d 1222 (9th Cir. 1974) .................................  5

*United States v. Stoterau*,
    524 F.3d 988 (9th Cir. 2008) ............................. 13-14

**STATUTES:**

18 U.S.C. § 983 ......................................... passim

**RULES**

Fed. R. Civ. P. 10(a) ...................................... 13

Fed. R. Civ. P. 53 ......................................... 13

Fed. R. Crim. P. 41(f)(1)(C) ...............................  6

**MISCELLANEOUS:**

Fed. Jud. Ctr., Manual for Complex Litigation
    § 11.52 (4th ed. 2004) ...................................13

iii

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2    Plaintiffs who seek to remain anonymous are improperly asking

3 this Court to enter a temporary restraining order ("TRO") that would

4 radically alter the status quo and preemptively grant them all the

5 relief they want in a preliminary injunction.  Plaintiffs have not

6 established grounds for a TRO or even for an order to show cause

7 ("OSC") re preliminary injunction

8    Plaintiffs ask this Court to order the government not to

9 conduct an investigation of anyone who used the anonymous storage

10 facilities of U.S. Private Vaults ("USPV")—which has been indicted

11 for conspiring with its customers to launder money, distribute

12 controlled substances, and structure transactions to evade currency

13 reporting requirements.  They argue that a failure to grant them a

14 TRO would cause irreparable harm even though, as they acknowledge,

15 the property in the safety deposit boxes has merely been moved from

16 one storage facility (USPV) to another (a secure warehouse

17 controlled by the FBI), and that no searches of the boxes are now

18 occurring or are planned, except based on warrants for individual

19 boxes.  The Court should decline the anonymous plaintiffs'

20 extraordinary request to halt a criminal investigation, and deny the

21 TRO and OSC, as it previously did in *John Doe v. United States of*

22 *America, et al.*, Case No. 2:21-cv-02803-RGK-MAR (dkt. 17.) There is

23 no reason plaintiffs cannot proceed by way of a regularly noticed

24 motion.

25    **A.   BACKGROUND REGARDING USPV**

26    USPV offers a unique service in California:  the anonymous

27 rental of safety deposit boxes.  While banks and other private vault

28 companies offer similar services at much lower prices, none permit

1

their customers to remain anonymous.  It is this anonymity that USPV

advertises on its website to attract customers: "Complete Privacy;

Biometric Identification; No ID Required."  www.usprivatevaults.com.

By providing and promoting total anonymity, USPV caters to and

attracts criminals, who seek to keep their identities and the source

of their cash beyond the reach of law enforcement and the IRS.

USPV's website states, "Our business is one of very few where

**we don't even want to know your name**.  For your privacy and the

security of your assets in our vault, **the less we know the better**."

(*Id.*) In a posting entitled, "Four Reasons to Store Your Gold At

USPV," USPV argues: "Banks require clients to provide their social

security number and a photo identification as a condition for

renting a safe deposit box. Your information is then filed in the

bank's central data system. This information can be easily accessed

by government agencies (such as the IRS) or attorneys armed with

court orders. If no one is aware you have a safe deposit box, the

contents (your gold) are much safer."  It goes on to explain that,

"As government chartered institutions, banks are now required to

file 'suspicious activity reports.' . . . . U.S. Private Vaults is

not subject to federal banking laws and would only cooperate with

the government under court order."

**B.    FACTS**

The Grand Jury indicted USPV for conspiring with its customers

to launder money, distribute drugs, and structure financial

transactions to avoid currency reporting requirements.  (Exh.)

The government obtained a sealed criminal seizure warrant for,

among other things, the nests of safety deposit boxes located at

USPV.  During the week of March 22 through 26, federal agents

executed the seizure warrant and removed the nests of safety deposit
boxes, inventorying their contents in the process, as authorized in
the seizure warrant and discussed in the affidavit supporting it.
(Brown Decl. ¶ 3).  The inventory was completed on site.  Agents
left USPV on March 26, 2021.  All the inventory searches were
completed by March 26, 2021, so absent additional justification,
such as a search warrant for specific boxes, no further examination
of their contents will occur.  (Palmerton Decl. ¶ 2).  The inventory
of the contents of the boxes revealed, among other items, firearms,
illegal drugs, and anonymous stores of wealth, mostly cash.  The
most frequently inventoried item was cash in the form of stacks of
$100 bills, often filling the entire box, and exceeding $1 million
in the largest boxes.  Drug detecting dogs alerted to most, but not
all, of the cash stashes.  (Palmerton Decl. ¶ 3).  The FBI has no
plans to dispose of or alter any of the items in its custody,
including the seized safety deposit boxes themselves. (Palmerton
Decl. ¶ 2).

The boxes the plaintiffs claim are theirs all contained cash,
ranging from hundreds of thousands of dollars, to over $1,000,000.
Drug-detecting dogs alerted to all the cash plaintiffs' claim,
except for one box in which the cash was vacuum-packed, a technique
drug traffickers employ to foil drug-sniffing dogs.  (Palmerton
Decl. ¶ 4).

The FBI has already begun returning the contents of boxes to
verified claimants, and has already received at least one false
claim from someone with no connection to USPV who hoped for a
windfall.  (Palmerton Decl. ¶¶ 6-7.)

3

**C.   PLAINTIFFS HAVE NOT ESTABLISHED A BASIS FOR INTERFERING WITH A CRIMINAL INVESTIGATION OR ANY IRREPARABLE INJURY**

The standard for issuing a TRO is substantially identical to the standard for issuing a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Preliminary injunctive relief is "an extraordinary remedy," *Sociedad Anonima Vina Santa Rita v. U.S. Dep't of the Treasury*, 193 F. Supp. 2d 6, 13 (D.D.C. 2001), that "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citations omitted).

A plaintiff "must establish that she is likely to succeed on the merits, that she is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in her favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977).

The anonymous plaintiffs here seek to enjoin criminal investigations that could involve hundreds of persons.  In so doing, they "'bear[] an almost insurmountable burden.'"  *Olaguez v. Russoniello*, 770 F.2d 791, 800 (9th Cir. 1985) (quoting *LaRouche v. Webster*, 566 F. Supp. 415, 417 (S.D.N.Y. 1983)).  That is because criminal investigatory decisions are committed to the Executive Branch, and intruding upon that Executive Branch function risks violating the separation of powers.  *Id.* at 799; *see also United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case[.]"); *United States v. Derrick*, 163 F.3d 799, 824–

4

25 (4th Cir. 1998) ("The caselaw is legend from the Supreme Court and the courts of appeals that the investigatory and prosecutorial function rests exclusively with the Executive."); *United States v. Olson*, 504 F.2d 1222, 1225 (9th Cir. 1974) (separation of powers commands "that the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions"). Hence, "only in extraordinary circumstances" may courts "entertain an action to enjoin a prosecutor's investigatory activities." *Olagues*, 770 F.2d at 799. Plaintiff must show "egregiously illegal conduct" supported by a "clear basis in fact and law" supporting the extraordinary remedy he seeks. *Id.* at 799-800 (citations omitted). Courts do not function as a "'super prosecutor' empowered to monitor all prosecutorial activities on a day-to-day basis, absent compelling, extraordinary circumstances." *Id.* at 803.

Here, the government obtained a federal criminal seizure warrant for the nests of safety deposit boxes which discussed inventorying the contents of the individual boxes. The judiciary thereby already fulfilled its role of assessing probable cause and found that it was established. It is not now the function of the courts to oversee or interfere with the government's ongoing investigation. *See Olagues*, 770 F.2d at 799-801; *United States v. Burzynski Cancer Rsch. Inst.*, 819 F.2d 1301, 1312 (5th Cir. 1987); *LaRouche*, 566 F. Supp. at 417-18. Plaintiffs fail to establish circumstances so extraordinary as to permit judicial interference with the government's investigations.

Even if judicial intervention were allowed, it would be unwarranted. Most glaringly, plaintiffs fail to establish

irreparable harm.  Such harm is necessary to warrant either a TRO or relief under Rule 41(g).  *See Winter*, 555 U.S. at 20; *Ramsden v. United States*, 2 F.3d 322, 325 (9th Cir. 1993).  "The mere threat of prosecution is not sufficient to constitute irreparable harm."  *Ramsden*, 2 F.3d at 326.

Plaintiffs' claim that they are irreparably harmed by the "deprivation of constitutional rights" mischaracterizes the case they cite.  The plaintiffs in *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012), were Latino individuals in a county where the sheriff had adopted a policy of racial profiling.  *Id.* at 994.  They were thus subject to repeated constitutional violations.  This case involves nothing of the sort; the inventorying of the contents has been completed.  And the contents of the safety deposit boxes remain safe in storage.

**D.  PLAINTIFFS ARE NOT ENTITLED TO SERVICE OF THE WARRANTS AGAINST USPV, OR AN INVENTORY OF THE ITEMS SEIZED, WHICH WOULD UNDERMINE THE VERIFICATION PROCESS IN ANY EVENT**

Plaintiffs ask the Court to order the government to provide them with copies of the sealed warrants executed on USPV, as well as copies of the inventory of the items seized.  Plaintiffs assert that the "officer executing a search and seizure warrant must give a copy of the warrant and a receipt for the property taken to the person from whom the property was taken.  Fed.R.Crim.P. 41(f)(1)(C)."  In fact, that rule provides three alternative methods of serving a search warrant.  The officer may "give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property."  Fed.R.Crim.P. 41(f)(1)(C).  Here, the warrants

authorized the seizure of USPV's property were properly served on
USPV by leaving them that "at the place where the officer took the
property," satisfying Rule 41.  (Palmerton Decl. ¶ 8.)  Further,
defendants do not actually want the inventory of the seizure warrant
served on USPV, which describes generically taking nests of safety
deposit boxes.  They want a list of the items found during an
inventory of those boxes, i.e., the items in particular boxes.  But
Rule 41 does not govern inventory searches at all, which are
administrative, not criminal.  Further, providing the plaintiffs
with an inventory of the boxes would be disastrous for attempting to
verify what may be false claims for valuables, which the FBI has
already received, as the FBI could no longer distinguish between
someone who knew what was in a box because it was his, and someone
who opportunistically pretended to be that person after reading what
had actually been found in that box.

    **E.   PLAINTIFFS HAVE FAILED TO SHOW A RISK OF SPOILATION**

    Having waited more than three weeks after the execution of the
USPV warrants to contact the government, plaintiffs now demand
urgently a TRO purportedly to prevent spoilation.  The inventory
search has been completed.  The government has no plans to destroy
or alter the seized safety deposit boxes.  (Palmerton Decl. ¶ 2.)
Plaintiffs have failed to show at this late date any risk of
irreparable harm warranting a TRO.

    **F.   PLAINTIFFS HAVE NOT DEMONSTRATED LIKELIHOOD OF SUCCESS ON
THE MERITS**

    Ordinarily, Rule 41(g) is used to seek the return of seized
property after an indictment has been issued.  *Ramsden v. United
States*, 2 F.3d 322, 324 (9th Cir. 1993).  District Courts, however,

have the power to entertain motions to return property seized by the government when no criminal proceedings are pending against a movant. *Id.* "These motions are treated as civil equitable proceedings, and, therefore, a district court must exercise 'caution and restraint' before assuming jurisdiction." *Id.* (quoting *Kitty's East v. United States*, 905 F.2d 1367, 1370 (10th Cir. 1990)); *see also Blinder, Robinson & Co., Inc. v. United States*, 897 F.2d 1549, 1557 (10th Cir. 1990) ("resort to the court's equitable powers to challenge the constitutionality of a search and to obtain the return of property should be reserved for extraordinary situations, not ordinary ones"); *Kiesel Company, Inc. v. Householder*, 879 F.2d 385, 389 (8th Cir. 1989)(such remedies "are extraordinary, and they must be used with restraint"); *Meier v. Keller*, 521 F.2d 548, 554 (9th Cir. 1975 (the court should only employ the "unique power" of an exercise of its equitable jurisdiction, if at all, with "caution and restraint").

The Ninth Circuit has noted that in order to "prevent the district courts from exercising their equitable jurisdiction too liberally," certain factors must be considered before the district court can reach the merits of a pre-indictment Rule 41(g) motion. *Ramsden*, 2 F.3d at 324. These factors include:

1)   Whether the movant has an individual interest in and need for the property he wants returned;

2)   Whether the movant would be irreparably injured by denying return of the property;

3)   Whether the movant has an adequate remedy at law for the redress of grievances; and

4)   Whether the government displayed a callous disregard for

the constitutional rights of the movant.

*Id.* at 325 (citing *Richey v. Smith*, 515 F.2d 1239, 1243-44 (5th Cir. 1975); *Kiesel Company, Inc.*, 879 F.2d at 387 (Movant must establish callous disregard of the Fourth Amendment, irreparable injury if relief is not granted, and lack of an adequate remedy at law); *Kitty's East*, 905 F.2d at 1370-71 (Movant must establish irreparable injury if he is deprived of his property and lack of an adequate remedy at law).

Here, the anonymous plaintiffs have not demonstrated irreparable injury if the items they claim were in their boxes are not returned. Moreover, they do have other remedies. They could, for example, make an administrative claim to the FBI for the return of their claimed property—-they just do not want to. Similarly, they could challenge the seizure of the contents of the boxes in either a criminal cases against them, or in forfeiture proceedings against the contents. Of course, the anonymous plaintiffs have made it difficult to discuss the likelihood of these events by refusing to identify themselves.

It would be reckless for the Court to order the return of any property here, for the Court has no way of knowing whether the anonymous plaintiffs actually have a property interest in anything. Plaintiffs act as though mere possession of a key that fits a box is "proof" that the property within it should be given to the lawyer who brings the key, but that is naive. It would only cost a few dollars to duplicate existing safety deposit box keys, which could lead to multiple claims for the same property. One criminal box holder could give duplicate keys to a confederate to claim the contents through unwitting plaintiff's counsel, and then come

forward himself with the genuine keys later and sue the government for the "loss" of the valuables in the box when the FBI could not produce them a second time.

Finally, as discussed previously, there has been no violation of plaintiffs' rights, let alone a callous one:  the contents of the boxes were taken in accordance with the procedures set forth in a federal criminal seizure warrant issued by a magistrate. Accordingly, the anonymous plaintiffs' Rule 41(g) motion will fail.

### G.    PLAINTIFFS MISUNDERSTAND THE FBI'S CLAIMS PROCEDURE

Plaintiffs misunderstand the FBI's "claims" procedure that is currently underway.  The government posted a notice at USPV after executing the seizure warrant on the nests of safety deposit boxes that invited, but did not compel, box holders to contact the FBI to make a claim to the property.  Upon receiving information from a box holder, the FBI attempts to determine whether the person making the contact is, in fact, the owner of the box, and lawfully owns the items inside.  Box holders previously gained access to their boxes at USPV through biometric verification, such as a retinal or hand-geometry scans, which can only be done in person.  Yet plaintiffs seek property they claim is theirs without subjecting themselves to any verification procedure other than their anonymous assertions to their lawyers that certain boxes are theirs, and possession of a key or keys that could easily be duplicated, altered, transferred, or stolen.  While plaintiffs may argue that they also described the "contents" of the boxes, that is not meaningful when most of the non-empty boxes contain cash, and the plaintiffs have declined to state how much they stored in their claimed boxes.

The FBI's claims procedure, which is not compulsory, is not typically provided when the government seizes property during the execution of a warrant. Accordingly, the government is providing box holders an additional method to claim their property. Further, the current procedure has nothing to do with asset forfeiture, but Plaintiffs have blurred the distinction between the claims procedure and asset forfeiture. While particular box items could be the subject of later asset forfeiture proceedings, it is equally the case that items within the boxes may never be the subject of any asset forfeiture proceedings. Put simply, the current claims procedure involves all items within a box (including, for example, paperwork) while asset forfeiture does not involve such items and has not yet even commenced.

The pertinent asset forfeiture statute, 18 U.S.C. § 983 titled "General Rules for civil forfeiture proceedings," sets forth the deadlines regarding when the government is required to advise parties of forfeiture proceedings. As to administrative forfeiture proceedings (referred to in the statute as "nonjudicial civil forfeiture proceedings"), which are administrative proceedings initiated by a seizing agency like the FBI, "the Government is required to send written notice to interested parties [such as the box holders here] . . . in a manner to achieve proper notice . . . and in no case more than 60 days after the date of the seizure." 18 U.S.C. § 983(a)(1)(A)(i). Using the March 22, 2021 commencement of the execution of the search warrant as the date of the seizure, the notice must be sent within 60 days thereafter, by May 21, 2021. In addition, "[i]f the identity or interest of a party is not determined until after the seizure . . . , notice shall be sent to

such interested party not later than 60 days after the determination by the Government of the identity of the party or the party's interest."  18 U.S.C. § 983(a)(1)(A)(v).  The notice of the commencement of administrative forfeiture is sent by letter.

Should the recipient wish to contest the seizing agency's administrative forfeiture of the asset, then a claim contesting the administrative forfeiture of the asset, in the form required by the statute, must be submitted within the deadline set forth in the notice letter (typically 35 days after the notice is sent) with the seizing agency.  18 U.S.C. § 983(a)(2)(B) and (C).  If a box holder files a claim contesting forfeiture of the property in the administrative forfeiture proceeding, then the government must file a judicial civil forfeiture action within 90 days after the claim contesting forfeiture is submitted to the seizing agency or else return the property.  18 U.S.C. § 983(a)(3)(A) and (B).

As a result of Plaintiffs' misunderstanding of the FBI's current claims procedures, plaintiffs mistakenly seek a TRO and injunction on asset forfeiture issues, as reflected in paragraphs 4 through 7 in their proposed order granting temporary restraining order.  Docket 6-8 at 2:22-3:10.  That request is improper in light of the fact that the "claims" procedure plaintiffs challenge has nothing to do with the rights a box holder can assert to contest any future asset forfeiture proceedings the government may decide to commence.  The box holders have shown no likelihood of irreparable injury, which is required for extraordinary injunctive relief, when they can assert their rights to contest any future forfeiture proceedings the government may initiate.

**H.   NO SPECIAL MASTER IS WARRANTED**

Because the plaintiffs' *ex parte* application for a TRO fails as described above, there is no need to consider their alternative request to appoint a special master.  Nevertheless, the FBI is perfectly capable of returning third-party belongings, as they do in myriad instances, and the plaintiffs have also failed to justify the extraordinary expense of a special master.  Cf., *Burlington N. R. Co. v. Wash. Dep't of Revenue*, 934 F.2d 1064, 1071 (9th Cir. 1991) (prior version of Rule 53 applies only in exceptional circumstances); Advisory Committee Notes to 2003 Amendment to Fed. R. Civ. P. 53 ("The core of the original Rule 53 remains, including its prescription that appointment of a master must be the exception and not the rule."); Fed. Jud. Ctr., Manual for Complex Litigation § 11.52 (4th ed. 2004) ("Reference to a special master must be the exception and not the rule.").  There are no exceptional circumstances here that provide a sufficient basis to appoint a special master.

**I.   PLAINTIFFS SHOULD NOT BE PERMITTED TO PROCEED ANONYMOUSLY**

The "use of fictitious names runs afoul of the public's common law right of access to judicial proceedings . . . and Rule 10(a)'s command that the title of every complaint 'include the names of all the parties'." *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067 (9th Cir. 2000) (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598–99 (1978); *EEOC v. Erection Co.*, 900 F.2d 168, 169 (9th Cir. 1990); Fed. R. Civ. P. 10(a)). "The normal presumption in litigation is that parties must use their real names." *Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate*, 596 F.3d 1036, 1042 (9th Cir. 2010); see also *United States v. Stoterau*, 524 F.3d 988,

13

1012 (9th Cir. 2008) ("As a general rule, the identity of the
parties in any action, civil or criminal, should not be concealed
except in an unusual case, where there is a need for the cloak of
anonymity."). "Nevertheless, many federal courts, including the
Ninth Circuit, have permitted parties to proceed anonymously when
special circumstances justify secrecy." *Advanced Textile Corp.*, 214
F.3d at 1067.  In this circuit, a party is "allow[ed] . . . to use
pseudonyms in the 'unusual case' when nondisclosure of the party's
identity 'is necessary . . . to protect a person from harassment,
injury, ridicule or personal embarrassment.'" *Id.* (quoting *United
States v. Doe*, 655 F.2d 920, 922 n.1 (9th Cir. 1981)).  Thus, "a
party may preserve his or her anonymity in judicial proceedings in
special circumstances when the party's need for anonymity outweighs
prejudice to the opposing party and the public's interest in knowing
the party's identity." *Id.* at 1068.  "The court must also determine
the precise prejudice at each stage of the proceedings to the
opposing party, and whether proceedings may be structured so as to
mitigate that prejudice."  *Id.*  "Finally, the court must decide
whether the public's interest in the case would be best served by
requiring that the litigants reveal their identities." *Id.*
Ultimately, "[t]he question is one of balance."  *Jane Roes 1-2 v.
SFBSC Mgmt., LLC*, 77 F. Supp. 3d 990, 993 (N.D. Cal. 2015).
"Applying this balancing test, courts have permitted plaintiffs to
use pseudonyms . . . when anonymity is necessary to preserve privacy
in a matter of sensitive and highly personal nature ...." *Advanced
Textile Corp.*, 214 F.3d at 1068 (internal quotation marks and
citations omitted).

Typically pseudo-anonymity (i.e., the parties and the court know the identity of the plaintiff, but it does not appear in the public record) has been granted when the plaintiff has been the victim of sexual abuse.  True anonymity (what plaintiffs seek, where neither the Court nor defendant even know the identity of the claimant) has almost never been granted because in most cases it is impossible to resolve the disputed facts without the defendant knowing the identity of the plaintiff in order to investigate the plaintiff's claims.  Indeed, even in the case relied upon by plaintiffs, *Advanced Textile Corp.*, the Ninth Circuit merely ruled that at an early stage of the litigation the balancing test tipped in favor of anonymity and expressly held that the district court would have to revisit the decision at later, more fact-intensive stages of the litigation.  214 F.3d at 1068.  In that case, the risk of unfair retaliation was clear because the plaintiffs had demonstrated that laborers who complained of unfair working conditions were fired, blackballed by employers, and deported to China where they faced imprisonment for failing to make good on the debts they incurred to labor recruiters.  Further, at that early stage of litigation in *Advanced Textile Corp.*, the identities of the particular plaintiffs was less important because they were complaining about work place practices and policies, not how they individually were treated.

Here, in contrast, the particular facts concerning each claimant are critical right from the beginning.  First, there is the need to verify that the plaintiffs really are the box holders they claim to be, which is especially troublesome given USPV's anonymous business model.  Second, there is the need to determine whether or

not the claimants lawfully possessed the items in the boxes they claim; the public interest is not served by returning criminal proceeds to criminals.  Third, there has been no showing that the government retaliates against claimants for making a claim.  To be sure, the government will investigate claims to determine if they have merit.  And the government will conduct criminal investigations where it has reason to believe that serious offenses have been committed, but that depends on what was in the box, not on whether there was a claim for that box.  Finally, a claimant only has to fear a criminal prosecution if, in fact, he is a criminal and the government can develop proof beyond a reasonable doubt of that. This is unlike the situation in *Advanced Textile Corp.* where merely making an unfair workplace claim would be sufficient to get a plaintiff fired, blackballed, and deported to face possible imprisonment for non-payment of recruiting fees.  Indeed, far from using anonymity to protect the powerless as in *Advanced Textile Corp.,* plaintiffs hope to use it to protect rich criminals from the consequences of their crimes, and to keep their ill-gotten gains. In this topsy-turvy world, plaintiffs would be privileged by their criminality and treated better than honest citizens who rented boxes at USPV, perhaps only because they lived around the corner, and granted the unusual privilege of litigating anonymously.  Finally, plaintiffs' desire to litigate anonymously would be as unworkable as it would be unfair.  There is no way the government could even determine that the plaintiffs were the true box holders, let alone that they lawfully owned the contents of the identified boxes, without knowing their identities.

16

**J.    CONCLUSION**

The government seized the nests of safety deposit boxes because there was overwhelming evidence that USPV was a criminal business that conspired with its criminal clients to distribute drugs, launder money, and structure transactions to avoid currency reporting requirements, among other offenses.  This has been borne out by the results of the inventory of the safety deposit boxes, which yielded fentanyl, OxyContin, firearms--and mostly huge stacks of $100 bills to which drug dogs alerted.  To be sure, some of the customers of USPV are honest citizens to whom the government wishes to return their property.  But the majority of the box holders are criminals who used USPV's anonymity to hide their ill-gotten wealth. To distinguish between honest and criminal customers, the government must examine the specific facts of each claim, precisely what the anonymous plaintiffs want to prevent by refusing to disclose their identities.  The Executive Branch is tasked with investigating criminal leads.  The public interest demands that the government pursue these leads vigorously.  Plaintiffs have failed to establish the likelihood of irreparable harm or success on the merits, or that their proposed injunction is in the public interest, among other requirements.  Accordingly, their *ex parte* application should be denied.

**DECLARATION OF AUSA ANDREW BROWN**

I, Andrew Brown, declare as follows:

1.   I am the Criminal Assistant United States Attorney assigned to the investigation around U.S. Private Vaults.

2.   I sought and obtained a sealed federal seizure warrant for certain business equipment at U.S. Private Vaults including the nests of safety deposit boxes there.  The warrant is still sealed, but the sealing order permits the executing agents to serve it, as they are obliged to.

3.   The affidavit in support of the warrant and the warrant itself discussed the agents inventorying the property contained in the individual safety deposit boxes within the nests, in accordance with the written inventory policies of the seizing agency, here the FBI.  They also discussed looking for contact information for the boxholders to notify them of the seizure so that they could seek the return of their property.

4.   I have attached a copy of the indictment against USPV.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on April 16, 2021.

/s Andrew Brown
_____
AUSA ANDREW BROWN

1

**<u>DECLARATION OF SA JUSTIN PALMERTON</u>**

I, SA Justin Palmerton, declare as follows:

1.    I am a Special Agent with the FBI.

2.    I personally participated in the inventorying of the contents of the safety deposit boxes at U.S. Private Vaults.  The inventory was completed on March 26, 2021.  No further inventory inspection occurred after that date, nor would it make any sense: it was a tremendous amount of work and it has already been done. Similarly, there are no plans to destroy or throw away the items currently stored at the FBI—including the boxes themselves—as plaintiffs state they fear.

3.    While inventorying the contents of the safety deposit boxes, agents recovered drugs including fentanyl and OxyContin, firearms including a Glock, and a variety of ways of storing wealth anonymously, such as gold bullion and especially cash, usually in $100 bills.  Most of the boxes which were not empty contained stacks of $100 bills; many of the boxes were filled with such stacks.  The largest boxes typically contained over $1 million in cash each. Drug detecting dogs alerted to most of the stashes of cash, but not all.

4.    According to the FBI's records, the boxes claimed by the plaintiffs Does 1-6 all contained cash, ranging from hundreds of thousands of dollars at the low end to over one million dollars at the high, and drug detecting dogs alerted to all the cash, except for one box in which the cash was vacuum-packed.  In my training and experience, drug traffickers sometimes vacuum-pack cash and other items specifically to foil drug detecting dogs.

1

5.   Contrary to the plaintiffs' assertions, there is no practice or policy of conducting a "criminal" investigation on each box or claim, which are treated individually.  No criminal investigation is undertaken absent suspicion.  So boxes containing items normally stored in a safety deposit box—important papers and jewelry, for example—are not criminally investigated.  Conversely, boxes containing suspiciously large sums of cash to which drug detecting dogs alert will be.

6.   The FBI has already verified that at least one claim it received for the contents of a box was actually made by a person who had never rented a box at USPV, and had no connection to USPV, but hoped for a windfall.

7.   The FBI has already begun returning the contents of boxes to verified claimants.

8.   The warrants executed on USPV were served by leaving them at that location with an inventory of the items taken.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on April 16, 2021.

/s *Justin Palmerton*

SA JUSTIN PALMERTON

2

FILED
CLERK, U.S. DISTRICT COURT

03/09/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DM___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2020 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>            v.<br><br>U.S. PRIVATE VAULTS, INC.,<br>   California Corporate<br>   Number C3405297,<br><br>            Defendant. | CR 2:21-cr-00106-MCS<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1956(h): Conspiracy<br>to Launder Money; 21 U.S.C. § 846:<br>Conspiracy to Distribute<br>Controlled Substances; 18 U.S.C.<br>371: Conspiracy to Structure<br>Transactions; 18 U.S.C.<br>§ 982(a)(1), 21 U.S.C. §§ 853 and<br>881(a)(6), 28 U.S.C. § 2461(c) and<br>31 U.S.C. § 5317(c): Criminal<br>Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1956(h)]

A.   INTRODUCTORY ALLEGATIONS

   1.   At times relevant to this Indictment:

      a.   Defendant U.S. PRIVATE VAULTS, INC. ("USPV"), a Nevada Corporation registered with the California Secretary of State, was in the business of renting safety deposit boxes to individuals who wished to do so anonymously.

      b.   Co-conspirator USPV Officer was an officer of USPV and

**EXHIBIT**

one of its owners.  USPV Officer dealt in marijuana, in violation of
the laws of California, as well as cocaine.

    c.   Co-conspirator USPV Manager was the manager of USPV.
USPV Manager helped USPV Officer arrange drug deals within USPV, and
helped USPV customers avoid detection by law enforcement, including
by advising them to structure their cash purchases to avoid reporting
requirements.

    d.   Co-conspirator Gold Business was a dealer in precious
metals and jewelry, and shared the same space as USPV, as well as
some employees.  Gold Business helped USPV customers convert their
cash into gold, and structured their cash transactions to avoid
federal reporting requirements.

    e.   Co-conspirator USPV Representative One was a
representative of USPV, and an owner of co-conspirator Gold Business.
USPV Representative One instructed USPV customers how to structure
transactions to avoid federal reporting requirements.

    f.   Co-conspirator USPV Representative Two was a
representative of USPV, and an owner of co-conspirator Gold Business.
USPV Representative Two instructed USPV customers how to structure
transactions to avoid federal reporting requirements.

B.   THE OBJECTS OF THE CONSPIRACY

    2.   Beginning in or before 2019, and continuing through the
date of this Indictment, in Los Angeles County, within the Central
District of California, and elsewhere, defendant USPV conspired with
others known and unknown to the Grand Jury to launder money, in
violation of Title 18, United States Code, Section 1956, namely:

    a.   to knowingly conduct and attempt to conduct financial
transactions involving the proceeds of a specified unlawful activity,

2

1  that is, the distribution of controlled substances, with the intent

2  to promote the carrying on of that specified unlawful activity, in

3  violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

4      b.    to knowingly conduct and attempt to conduct financial

5  transactions involving the proceeds of specified unlawful activity,

6  that is, the distribution of controlled substances, knowing that the

7  transactions were designed in whole or in part to conceal and

8  disguise the nature, location, source, ownership, and control of the

9  proceeds of specified unlawful activity, in violation of Title 18,

10 United States Code, Section 1956(a)(1)(B)(i); and

11     c.    to knowingly conduct and attempt to conduct financial

12 transactions involving the proceeds of specified unlawful activity,

13 that is, the distribution of controlled substances, knowing that the

14 transactions were designed in whole or in part to avoid a transaction

15 reporting requirement under Federal law, in violation of Title 18,

16 United States Code, Section 1956(a)(1)(B)(ii).

17 C.  <u>MANNER AND MEANS OF THE CONSPIRACY</u>

18     3.    The objects of the conspiracy were carried out and were to

19 be carried out, in substance, as follows:

20     a.    Defendant USPV would adopt business practices that

21 attracted customers in possession of proceeds from criminal offenses,

22 including drug trafficking, and not law-abiding persons.  Such

23 practices included: (1) touting the anonymity of the safety deposit

24 rentals that defendant USPV would provide, including by advertising

25 "we don't even want to know your name"; (2) boasting that, unlike

26 banks, its anonymous safety deposit box rentals did not require

27 customer information that "can be easily accessed by government

28 agencies (such as the IRS)"; (3) making arrangements for the payment

3

1  of the rental fees in cash and other ways that would be untraceable;

2  (4) issuing safety deposit box keys that were unmarked and unnumbered

3  so that law enforcement could not determine that the keys unlocked

4  safety deposit boxes at USPV; and (5) charging safety deposit box

5  rental rates several times higher than those at banks.

6        b.   USPV Officer would capitalize defendant USPV with the

7  proceeds of his illegal drug trafficking.

8        c.   USPV Officer would invite other drug traffickers who

9  knew and trusted him because of his illegal drug trafficking to store

10 the proceeds of their drug trafficking at defendant USPV.

11       d.   Employees of defendant USPV would conduct counter

12 surveillance of the neighborhood and warn customers when they

13 observed law enforcement.

14       e.   Agents of defendant USPV would instruct customers to

15 structure transactions to avoid currency transaction reports

16 including by purchasing gold and other precious metals through Gold

17 Business, which would structure transactions and not file required

18 currency reports.

19       f.   If agents of defendant USPV learned that law

20 enforcement was interested in searching or seizing the contents of a

21 particular customer's safety deposit box, they would attempt to warn

22 the customer, delay law enforcement, or even remove all but a nominal

23 amount of cash from the box for the customer, to prevent law

24 enforcement from discovering and seizing the bulk of the cash.

25       g.   Defendant USPV would deposit the cash proceeds it

26 received from its customers for safety deposit box rentals, which

27 included proceeds from the distribution of controlled substances,

28 into its bank account, and then use those proceeds to maintain USPV's

anonymous storage facilities for its criminal customers.

        h.   USPV Officer and USPV Manager would negotiate drug deals illegal under California law within the secured space of USPV, and USPV Officer would store the cash proceeds from drug deals within a safety deposit box at USPV.

        i.   USPV Manager would accept cash purportedly from illegal drug sales, and structure transfers of it to Gold Business in amounts not greater than $10,000 at a time in exchange for wire transfers that purported to be for the sale of precious metals.

COUNT TWO

[21 U.S.C. § 846]

4.   The Grand Jury realleges paragraph 1 of this Indictment here.

A.   OBJECTS OF THE CONSPIRACY

5.   Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to distribute controlled substances, including marijuana, a Schedule I controlled substance, and cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(1)(D).

B.   MANNER AND MEANS OF THE CONSPIRACY

6.   The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.   OVERT ACTS

7.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but not limited to the following:

Overt Act No. 1:  On June 28, 2019, USPV Manager distributed within USPV's business location six different butane hash oil vape cartridges containing THC to someone he believed to be a drug trafficker, but who was, in fact, a confidential informant working with law enforcement ("Confidential Informant 3"), as samples of what

6

defendant USPV could provide in bulk.

Overt Act No. 2: On July 26, 2019, USPV Officer met Confidential Informant 3 within USPV to sell him 1,000 vape cartridges containing THC.  USPV Officer delivered the cartridges in the parking lot of USPV, and received in exchange $8,000 in cash within USPV's business location.

Overt Act No. 3:  On or about December 11, 2019, during discussions for the sale of cocaine, USPV Officer instructed the buyer, Confidential Informant 3, to use a wireless communication application called "Signal," which is encrypted to communicate with him regarding the transaction.

Overt Act No. 4:  On or about December 16, 2019, USPV Officer instructed Confidential Informant 3 to come to USPV to complete the exchange.

Overt Act No. 5:  On or about December 16, 2019, USPV Manager called Confidential Informant 3 and explained that co-conspirator USPV Officer was not being careful enough, and could bring unwanted law enforcement attention to defendant USPV by conducting this drug deal onsite.

Overt Act No. 6:  On or about December 18, 2019, USPV Officer sold an ounce of cocaine to Confidential Informant 3 through intermediaries.

COUNT THREE

[18 U.S.C. § 371]

8.   The Grand Jury realleges paragraph 1 of this Indictment here.

A.   OBJECTS OF THE CONSPIRACY

9.   Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to knowingly and for the purpose of evading the reporting requirements of Section 5331 of Title 31, United States Code, and the regulations promulgated thereunder: (1) cause and attempt to cause a nonfinancial trade or business to fail to file a report required under Section 5331 of Title 31, and any regulation prescribed under any such Section, in violation of Title 31, United States Code, Section 5324(b)(1); and (2) structure, assist in structuring, and attempt to structure and assist in structuring, transactions with one or more nonfinancial trades or businesses, in violation of Title 31, United States Code, Section 5324(b)(3).

B.   MANNER AND MEANS OF THE CONSPIRACY

10.   The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.   OVERT ACTS

11.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but

8

not limited to the following:

    <u>Overt Act No. 1</u>:  On December 4, 2019, Gold Business sold jewelry for $11,900 in cash to a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 1"), and did not file the required IRS Form 8300.

    <u>Overt Act No. 2</u>:  On January 13, 2020, USPV Representative One told a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 4"), and who expressed an interest in buying $20,000 worth of precious metals in cash, to purchase only $10,000 at a time to avoid paperwork.

    <u>Overt Act No. 3</u>:  On January 28, 2020, USPV Representative Two told a DEA agent who was posing as a USPV customer and said he wanted to purchase $18,000 in gold, "I recommend you stay under $10,000 in cash and then you could just do some one day, and a few days later you could do the other," and explained, "If you buy less than $10,000 then there's no form."

    <u>Overt Act No. 4</u>:  On January 29, 2020, USPV Manager instructed Confidential Informant 3, who wanted to buy gold to pay a "skante" debt "down south," meaning a debt in Mexico for methamphetamine, to keep his purchases under $10,000 each:  "That way you don't have to give no social security, no ID. All that shit goes to the IRS."  USPV Manager introduced Confidential Informant 3 to co-conspirator USPV Representative One to purchase the gold.

    <u>Overt Act No. 5</u>:  On January 29, 2020, USPV Representative One explained to Confidential Informant 3 and his friend, who was actually an undercover police officer ("Undercover Officer"), that it was better to space out his cash purchases and keep each one under

1   $10,000:  "Don't come in every day. . . . what they look for is a
2   pattern of someone who with intention is trying to get around . . ."

3       Overt Act No. 6:  On January 29, 2020, when Undercover Officer
4   explained that he needed more than $10,000 worth of gold quickly,
5   USPV Manager suggested that he split the purchase between himself and
6   Confidential Informant 3, so that each purchase would be under
7   $10,000 individually.  USPV Representative One agreed to the ruse "as
8   long as you hand me the money" separately and fill out receipts for
9   two separate transactions.  USPV Representative One also agreed that
10  Undercover Officer could pick up the total gold purchase alone the
11  following day.

12      Overt Act No. 7:  On January 29, 2020, USPV Representative One
13  accepted first $9,900 in cash from Undercover Officer and then
14  another $5,000 which Undercover Officer handed to Confidential
15  Informant 3, who then handed it to USPV Representative One.

16      Overt Act No. 8:  On January 30, 2020, USPV Representative One
17  delivered nine ounces of gold bullion to Undercover Officer.

18      Overt Act No. 9:  On November 17, 2020, USPV Manager accepted
19  $25,000 in cash from Confidential Informant 3, who said it was from
20  the sale of "skante" (methamphetamine), and structured the transfer
21  of it to Gold Business in exchange for wire transfers of $10,000 and
22  $12,000, purportedly from the sale of gold, to launder the cash.

23

24

25

26

27

28

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982(a)(1)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(1), in the event of defendant USPV's conviction under Count One of this Indictment.

2.    Defendant USPV shall forfeit to the United States the following property:

      a.    All right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in Count One of this Indictment, including, without limitation the property set forth in paragraph 3 below; and

      b.    A sum of money equal to the total value of the property described in subparagraph a above.

3.    The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

      a.    The business computers;

      b.    The money counters;

      c.    The nests of safety deposit boxes and keys;

      d.    The digital and video surveillance and security equipment; and

      e.    The biometric scanners.

4.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b),

11

defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[21 U.S.C. § 881(a)(6), 28 U.S.C. § 2461(c)

and 21 U.S.C. § 853]

1.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 21, United States Code, Section 881(a)(6), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853, in the event of defendant USPV's conviction under Count Two of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal:

i.   constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; or

ii.   used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

b.   A sum of money equal to the total value of the property described in subparagraph a above.

///

3.   The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on one or more of the grounds set forth in paragraph 2 above:

        a.   The business computers;

        b.   The money counters;

        c.   The nests of safety deposit boxes and keys;

        d.   The digital and video surveillance and security equipment; and

        e.   The biometric scanners.

4.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[31 U.S.C. § 5317(c) and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 31, United States Code, Section 5317(c), and Title 28, United States Code, Section 2461(c), in the event of defendant USPV's conviction under Count Three of this Indictment.

2.    Defendant USPV shall forfeit to the United States the following property:

a.    All right, title, and interest in any and all property, real or personal, involved in or traceable to the offense set forth in Count Three of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

b.    A sum of money equal to the total value of the property described in subparagraph a above.

3.    The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

a.    The business computers;

b.    The money counters;

c.    The nests of safety deposit boxes and keys;

d.    The digital and video surveillance and security equipment; and

e.    The biometric scanners

4.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 31, United States Code, Section

15

5317(c)(1)(B), and Title 28, United States Code, Section 2461(c), defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/
_____
Foreperson

TRACY L. WILKISON
Acting United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

ANDREW BROWN
Assistant United States Attorney
Major Frauds Section